IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MITZI BAKER,                        )
                                    )
            Plaintiff,              )
                                    )
      v.                            )       No. 02 C 525
                                    )
                                    )       Judge Mark Filip
JOHN E. POTTER, Postmaster General  )
for the United States,              )
                                    )
            Defendant.              )

## MEMORANDUM OPINION AND ORDER

Plaintiff Mitzi Baker ("Baker" or "Plaintiff") has filed a second amended complaint (D.E.

36)[1] against the United States Postal Service ("Postal Service" or "Defendant") alleging

employment discrimination on the basis of disability and retaliation in violation of the

Rehabilitation Act, 29 U.S.C. § 791 *et seq.*, and the Americans with Disabilities Act ("ADA"),

42 U.S.C. § 12101 *et seq.* The case is before the Court on Defendant's Motion for Summary

Judgment ("Motion"). (D.E. 53.) For the reasons stated below, the Motion is granted.

### BACKGROUND

The Court takes the relevant facts from Defendant's Local Rule 56.1 ("L.R. 56.1")

statement of facts and exhibits (D.E. 54 ("Def. SF")), from Baker's response to Defendant's

statement of facts and statement of additional facts (D.E. 62 ("Pl. Resp." and "Pl. SAF,"

respectively)), and from Defendant's reply thereto (D.E. 65 ("Def. Reply")). Where the parties

---

[1] The various docket entries in this case are cited as "D.E. ___."

1

disagree over relevant facts, the Court sets forth the competing versions. In addition, the Court, as it must, resolves genuine factual ambiguities in Plaintiff's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

I.    Procedural Issues

    A.    Lack of Compliance With Local Rule 56.1

L.R. 56.1 requires that statements of facts contain allegations of material fact, and the factual allegations must be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). While this Court is generally solicitous of *pro se* plaintiffs confronting the procedural requirements of summary judgment adjudication, precedent teaches that a *pro se* litigant is not exempt from meaningfully complying with L.R. 56.1 or provided blanket immunity from the requirements of that Rule. *See, e.g., Greer v. Bd. of Educ. of the City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001); *Stevens v. Navistar Int'l Transp. Corp.*, 244 F.Supp.2d 906, 910 (N.D. Ill. 2002) (St. Eve, J.) (collecting cases); *accord Members v. Paige,* 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced"). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See, e.g., Koszola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (collecting cases)).

The Court notes that Plaintiff has improperly denied most of Defendant's factual assertions by failing to explain why the proffered evidence is inadequate or objectionable (*see, e.g.*, Pl. Resp. ¶¶ 14, 15, 17, 18, 20, 21, 23, 25, 26, 30, 31, 39) or by citing to evidentiary material

2

that does not support the reasons given for her denial (*see, e.g.*, Pl. Resp. ¶¶ 9-11, 13, 16, 37, 38, 44). Thus, where those factual assertions are properly supported by the record, the Court deems them admitted by Defendant for purposes of this motion. *See Malec*, 191 F.R.D. at 584. The Court also deems some of Plaintiff's statements of fact admitted where Defendant does not provide sufficient (or any) evidentiary support for its denial. (*See, e.g.*, Def. Reply ¶¶ 39 (denied by Defendant on grounds of relevance; deemed admitted to extent relevant), 40 (first sentence deemed admitted for same reason; second sentence disregarded by Court for lack of evidentiary support); 66 (deemed admitted that Baker was ordered to deliver mail to apartment buildings).[2])

Many of Plaintiff's citations to support her version of events simply do not provide support for the facts asserted. (*See, e.g.*, Pl. SAF ¶¶ 12, 14, 17, 18, 20, 22, 23, 28, 37, 64, 70, 71.) On more than one occasion, Plaintiff's statements consist of arguments or conclusions of law rather than fact—conclusions which the Court will disregard. (*See, e.g.*, Pl SAF ¶¶ 28, 36, 37, 46, 51, 52, 63, 65, 69.) Plaintiff even occasionally cites to evidentiary materials that do not exist in the record. (*See, e.g.*, Pl. SAF ¶ ¶ 14 (citing non-existent Pl.'s Ex. "G" and "H"); *see*

---

[2] Defendant objects to the statement in Plaintiff's paragraph 66 on the grounds that Plaintiff did not cite specific paragraphs in the two affidavits cited. (Def. Reply ¶ 66.) Although Defendant is generally correct that the Court has no obligation to scour the record, *see Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004), the two affidavits are each 10 paragraphs or less, so the Court has attempted to review the affidavits in their entirety to see if they support the assertions made. Defendant also objects on the grounds that the affidavits do not support the statement and that the statement is argumentative or contains a legal conclusion. (Def. Reply ¶ 66.) The Court agrees that the portion of the statement that the Postal Service ordered her to deliver mail to the buildings "without an accommodation" is not supported in the affidavit testimony and contains a legal conclusion as to what constitutes a proper accommodation. The Court will thus disregard that portion of the statement, along with Baker's unnecessary editorial comment "regardless to their testimony that they did."

3

*also* Pl. Resp. ¶ 28 (citing non-existent Pl.'s Ex. "M").)[3]  Plaintiff also fails to sufficiently identify some record citations which may conceivably support her assertions of fact—citing, for example, to multiple pages of transcript testimony (*see, e.g.*, Pl. SAF ¶¶ 31 (citing "Pl. Ex. 18," which is some 25 pages of court hearing transcripts spanning multiple occasions), 44 (citing "PL. Ex. 24 at 47-79," which is a witness deposition, although some of the cited pages do not appear to exist), 45 (same)) or even entire depositions to support Plaintiff's factual claims (*see, e.g.*, Pl. SAF ¶¶ 17, 20, 24-26 (citing "Pl. Ex. 21")). Plaintiff also cites generally to her 42-paragraph affidavit. (*See, e.g.*, Pl. SAF ¶¶ 13, 15, 48, 49.)  This practice of general citation is inappropriate under local rules and caselaw applying it. *See, e.g., Malec*, 191 F.R.D. at 583 ("specific reference" in L.R. 56.1 means page and paragraph numbers). It is not the job of the Court to scour through pages of deposition testimony, transcripts of court proceedings, or lengthy affidavits to attempt to determine if a litigant's factual claims are well-taken. *See, e.g., Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004). In fact, doing so would delay the adjudication of motions and cases involving litigants who have actually complied with well-settled local rules designed to facilitate reasonably prompt adjudication of cases for everyone.

As a result of the above failures to comply with L.R. 56.1, the Court does not consider many of Plaintiff's improperly supported factual assertions. Thus, the recitation of facts below

---

[3]  Plaintiff's exhibits are numbered 1-50; she offers no alphabetic exhibits. Defendant offers exhibits labeled 1-3 and A-F. The Court has been unable to locate any exhibits labeled G, H, or M. The Court has attempted to see if Plaintiff simply gave an alphabetic citation for what otherwise would be the corresponding numeric designation (e.g., erroneously citing an "exhibit 13" as an "exhibit M," or an "exhibit 7" as an "exhibit G"). This mislabeling does not appear to have occurred. Accordingly, the Court has not credited factual assertions based on non-existent exhibits.

consists of those relevant statements of fact that the Court finds properly supported by the record.

      B.      Protective Order Does Not Prohibit Use of Stipulation and Settlement Agreement

As another initial matter, the Court will address Plaintiff's objections to Defendant's use

of the Stipulation and Settlement Agreement (Def. Ex. 1) that Plaintiff and the Postal Service

entered into in January 2002. Plaintiff states that "Plaintiff is precluded from disclosure [of the

settlement agreement] under a protective order pursuant to Fed. R. Civ. P. 26(c)." (Pl. Resp. ¶¶

58-65, 67, 69; *see also* Pl. Resp. Br. at 14 (arguing that Postal Service violated non-disclosure

provisions of settlement agreement).) Plaintiff moved for protective orders in earlier stages of

this case (*see* D.E. 12, 29, 37) based on the paragraph which states, "Mitzi Baker and the

Postmaster General agree that they will not divulge the existence or terms of this Stipulation and

Settlement Agreement except as necessary to implement its terms or as required by law,

regulation, or contract." (Def. Ex. 1, ¶ 4.) This Court has reviewed the rulings made on the

record by Judge Kennelly, who originally ruled on this issue,[4] and has found only that Judge

Kennelly ordered that the settlement agreement be placed under seal. (*See* D.E. 15; Pl. Ex. 18,

Hr'g Tr. Mar. 13, 2003, at 8.) Judge Kennelly ordered Plaintiff to produce the settlement

agreement (although Defendant already had a copy) but did not rule "on what the ultimate

consequences" of the agreement are in this case. (Pl. Ex. 18, Hr'g Tr. Feb. 25, 2004, at 5.)

Nowhere did Judge Kennelly enter a protective order prohibiting Defendant from utilizing the

settlement agreement as appropriate here. Indeed, as Defendant is correct in its argument that

Baker's claims are barred by the settlement agreement, *see* discussion below, Defendant has the

right under the contract to divulge it "as necessary to implement its terms." Thus, Plaintiff's

---

[4] In March 2004, this case was reassigned from Judge Kennelly to this Court.

objections to the disclosure of the settlement agreement are overruled.[5]

II.    Facts

Baker began working as a Letter Carrier for the Postal Service on January 28, 1989. (Pl. SAF ¶ 1.) Baker worked at the following stations during time periods relevant to this case: Graceland Annex, 1991 through August 1992; Jackson Park, March 1993 through August 1995; and Merchandise Mart, June 1996 through February 2002. (Pl. SAF ¶ 2.) Generally, the essential functions of a letter carrier include casing mail in sequence for delivery along an established route, delivering mail by foot or by vehicle, and, in some instances, routes may consist exclusively of delivery of parcel posts or collection of mail. (Pl. SAF ¶ 3.) The specific duties for a carrier at Merchandise Mart require the carrier to push a "six row cart" (not explained) filled with mail on all floors while making deliveries; the weight of the cart with mail is approximately 400 to 500 pounds, and the carrier must carry all parcels and is responsible for doing collections as instructed. (Def. SF ¶ 42; Def. Ex. 2 at 82.)

In January 1992, Baker suffered frostbite to her feet from which she apparently developed a foot condition known as plantar fasciitis. (Def. SF ¶ 5.) Because of her injuries, Baker was placed on limited Letter Carrier duties, and at the time she worked at the Jackson Park station, she was under restrictions that she was to perform seated work only, using a chair with a rest bar,

---

[5] In addition, and contrary to Plaintiff's argument, there is substantial reason to doubt that the settlement agreement in this case could remain under seal once it became central to the resolution of the in-court litigation at hand. *See Baxter Int'l, Inc. v. Abbott Labs*, 297 F.3d 544, 546 (7th Cir. 2002) (stating that in "civil litigation only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault), is entitled to be kept secret . . . .") (collecting authorities).

and that she was to have no prolonged standing while on duty. (Def. SF ¶ 6.) Thus, at the Jackson Park station, Baker was able to case the mail for five routes, but she was not able to perform the full duties of a carrier.[6] (Def. SF ¶ 9.)

Under the union contract between the Postal Service and the National Association of Letter Carriers Union ("NALC"), an employee who cannot perform the duties of his bidded assignment within a one-year time period must relinquish that assignment. (Def. SF ¶ 11; Pl. SAF ¶ 8.) Baker is a member of the NALC, a union that serves as the exclusive bargaining agent for letter carriers. (Def. SF ¶ 12.) In June 1994, the Jackson Park Station Manager, Leslie Thomas, notified Baker that she had held her Letter Carrier position for more than one year, that she had not performed the duties required of that position during that year, and that her position would be posted as vacant due to her inability to perform full duties. (Def. SF ¶ 14.) The Postal Service states that on July 26, 1994, it scheduled approximately 30 employees who had been on limited duty for a prolonged period of time, including Baker, for interviews so that they could be placed in suitable, modified work positions in accord with their work restrictions. (Def. SF ¶ 15.) Thomas sent a routing slip dated October 17, 1994, to the Injury Compensation Unit

---

[6] Plaintiff attempts to deny this statement by citing to a letter from John Richardson (who apparently is the manager of Human Resources for the Postal Service in Chicago) that generically states: "To Whom It May Concern: Mitzi G. Baker worked for the Postal Service from January 28, 2989 to February 1, 2002. She performed the duties of a City Letter Carrier. Her primary responsibilities were to deliver the mail to customers on an assigned route. She cased and sequenced the mail on the route, sorted mail for the throwback case and furnished customers with postal information when requested." (Pl. Resp. ¶ 9; Pl. Ex. 3.) As best the Court can tell, this letter, which is dated the month after Baker had resigned from the Postal Service, is a perfunctory reference to provide general information about Baker's former employment with the Postal Service. Contrary to Baker's assertion, this single letter is not a concession by the Postal Service that Baker was capable of performing, or was indeed performing, all the duties of a letter carrier at any particular time or during the particular time of the events in this case.

7

requesting that Baker undergo a fitness-for-duty examination, purportedly so that she could be relocated to a suitable work position which would fit within her work restrictions. (Def. SF ¶ 16.) (It is not clear from the record whether Baker had that examination.) According to the Postal Service, there was no position at the Jackson Park Station which fit within Baker's work restrictions. (*Id.*)

On March 25, 1995, Thomas requested that Baker undergo another fitness-for-duty examination, purportedly to determine the exact nature of her injury, how the injury was preventing her from performing her job, whether x-rays substantiated her injury, and what was being done to return her to full duty. (Def. SF ¶ 21.) On April 10, 1995, the Postal Service's Medical Officer directed Baker to report to a fitness-for-duty examination to take place on April 17, 1995. (Def. SF ¶ 23.) In April 1995, the Medical Officer made findings that Baker was not fit for the Letter Carrier position, her condition was likely to be permanent and not to improve, and she should be assigned to a change in craft. (Def. SF ¶ 24.) The doctor further indicated that due to high risk of further injury, she was not medically qualified to perform the essential functions of the position, and accommodations would not reduce the medical risk or restriction. (Def. SF ¶ 24.) The Medical Officer recommended that Baker return to work under a grant of limited duty by the Injury Compensation Unit until October 4, 1995, and Baker was directed to submit medical information from her treating physician. (Def. SF ¶ 25.)

On April 18, 1995, Dr. Horsley, Baker's treating podiatrist, sent a letter to the Postal Service's Medical Unit. (Def. SF ¶ 26 (citing Def. Ex. 2 at 36).) In that letter, Baker's podiatrist rhetorically asked, "Is she able to perform the job of a [letter] carrier?" (Def. Ex. 2 at 36). Baker's podiatrist answered: "No . . . she is not recommended for the carrier position," after

8

discussing her ongoing foot problems. (*Id.*) Baker's podiatrist added that he suggested that she "either remain on light duty or be reassigned to a non-carrier duty within the postal service." (Def. SF ¶ 26.)

On May 5, 1995, the Postal Service's Human Resources Department apparently began some kind of search for a position which was compatible with Baker's work restrictions. (Def. SF ¶ 29.) The Postal Service stated that "reassignment [of Baker would] allow [the Postal Service] to fill the vacancy with an employee who can fully perform the duties of the position." (*Id.*; Def. Ex. 2 at 38.) On May 12, 1995, Thomas sent a letter to Human Resources which described the duties to be performed by Baker in her reassignment. (Pl. SAF ¶ 20; Pl. Ex. 12.) On September 5, 1995, Baker went on a period of administrative leave with full pay for reasons unspecified in the record. (Def. SF ¶ 32.) The Postal Service subsequently began communicating with Baker concerning returning to work. (Def. SF ¶¶ 35, 36.) The Postal Service indicated in a letter that it was considering placing her at Merchandise Mart (a station assignment which she apparently had been seeking for some time (*see* Pl. SAF ¶ 72)) but told her that "it is necessary that you provide me [the Postal Service's attorney] with medical documentation from Ms. Baker's physician stating that she is physically fit to perform the duties of a letter carrier position in the Merchandise Mart." (Def. SF ¶ 37; Def. Ex. 2 at 86.) According to the Postal Service, there were no limited or light duty jobs available at the Merchandise Mart. (Def. SF ¶ 40.) Baker would not submit to a physical examination by Dr. Horsley. (Def. SF ¶ 47; *see also* Def. SF 39.) In subsequent correspondence between Baker and the Postal Service, each party indicated its difference of opinion as to whether Baker need submit to another physical examination in order to determine her fitness for being placed at Merchandise Mart. (Def. SF ¶¶

41-47.) In a letter dated February 2, 1996, Baker notified the Postal Service that she would not submit to a medical examination as a prerequisite to reassignment to Merchandise Mart. (Def. SF ¶ 47.) On February 28, 1996, the Postal Service issued Baker a notice for a fitness-for-duty examination. (Def. SF ¶ 48.) (It is not clear from the record whether she had that examination.) At some point by 1997, Baker was reassigned as a Letter Carrier at Merchandise Mart. (Def. SF ¶ 53.)

Baker offers evidence of other behavior by her supervisors that she argues constitutes discrimination or retaliation. On several occasions during the time that Baker worked at the Jackson Park station, her supervisors ordered her to deliver mail to apartment buildings, apparently in violation of her medical restrictions. (Pl. SAF ¶ 66.) On August 16, 1995, in the presence of a supervisor, one of Baker's co-workers threatened her in some unspecified way. (Pl. SAF ¶ 67.) Her supervisor laughed about the incident rather than taking any action in accordance with Postal Service policy.[7] (Id.)

_____

[7] Baker also states that she was subject to a hostile work environment (Pl. SAF ¶ 21) and was harassed by Jackson Park supervisors (Pl. SAF ¶ 69)—both of which are legal conclusions—but she does not provide any further details in her summary judgment papers about what incidents or behaviors purportedly would constitute such harassment or hostile environment. Baker also discusses, or at least alludes to, other incidents of behavior she describes as discriminatory or retaliatory in her Memorandum In Opposition to [the Motion]. (D.E. 61.) For example, Baker states, "Jackson Park management . . . disciplined Baker with verbal reprimands without justification" (id. at 3), and "The Agency engaged in threats of violence against her" (id. at 5). She also argues that the Postal Service ignored her repeated requests for "reassignment to the Merchandise Mart facility as a reasonable accommodation" (id. at 21), and that her supervisors knowingly forced her to perform duties and assignments which were beyond her documented medical restrictions (id. at 22). (The only instances specified of the latter type were occasions when she had to deliver mail in particular buildings, described above.) Apart from the fact that Baker did not include these facts in her statement of additional facts, and they are thus not properly before the Court, Baker does not provide any record support for these statements. As such, the unsupported accusations, made in violation of Local Rule 56.1, are disregarded.

Baker has an extensive history of employment disputes with the Postal Service, the majority of which are irrelevant to the case at hand. In 1991, she brought a successful sexual harassment suit against her supervisors at the Graceland Annex station, and she was awarded $75,000 in compensatory damages. (Def. SF ¶ 7.) Apparently, as part of that suit, the Postal Service was supposed to transfer Baker to the station of her choice. In 1994 and 1995, she filed complaints of retaliation and discrimination against new supervisors at the Jackson Park station, but those claims were rejected by the federal courts. (Def. SF ¶ 18, 22.)

In January 1996, Baker contacted the EEO office to file an informal complaint that initiated this lawsuit, alleging discrimination on the basis of physical disability and retaliation from previous EEO activity. (Def. SF ¶ 33.) In the initial interview with the EEO counselor, Baker provided the following specifics concerning her complaint: the EEO activity which she believed caused her to suffer retaliation occurred on "Feb., 1995 and Nov. 5 [no year specified]," the incident that prompted her to seek EEO counseling occurred on "December 4, 1995," and the official responsible for the discriminatory and retaliatory action was "Mr. Leslie Thomas." (Def. SF ¶ 34.) Baker further specified that Thomas tried to remove or transfer her from her carrier position due to retaliation and discrimination and that he used a fitness-for-duty examination as an excuse to do so. (*Id.*) Baker filed a formal EEO Complaint of Discrimination on May 24, 1996. (Def. SF ¶ 50.) In that Complaint, Baker claimed that "Leslie Thomas, station manager and [sic] Jackson Park, discriminated against me." (Def. SF ¶ 50; Def. Ex. 2 at 131.) Baker explained that she was the victim of disability discrimination (based on her plantar fasciitis) and retaliation on December 4, 1995, when Thomas tried to get her removed from her carrier position. (*Id.*) In continuation sheets attached to Baker's complaint, she discussed Thomas's

11

alleged "reprisals" by seeking Baker's transfer from her current Jackson Park posting, and his alleged attempts to use fitness-for-duty examinations "to remove me from my carrier position." (Def. Ex. 2 at 132-33.)

In the early winter of 1996, after the EEO counselor submitted his report indicating that Baker's complaint had not been resolved in the informal EEO process (Def. SF ¶ 51), the Postal Service began an agency investigation into Baker's complaint. (Def. SF ¶ 51.) The agency defined the "Specific Issue(s)" of the investigation as "Attempt to reassign." (*Id.*)

Baker's allegations then were the subject of multiple administrative proceedings. In November 1997, an Administrative Law Judge ruled that Baker's claim could be rejected without a hearing, and that Baker "failed to establish a prima facie case of disability discrimination, harassment or reprisal." *Baker v. Henderson, Postmaster Gen'l, U.S. Postal Serv.*, EEOC Appeal No. 019819162, 2001 WL 953635, at *2 (June 26, 2001). On appeal, the EEOC Appeals Compliance and Appeals Coordinator, affirmed the ruling of the ALJ, and found "no unlawful employment discrimination based on retaliation or disability." (Def. Ex. 2 at 153-54 (*In the Matter of: Baker v. Runyon, Postmaster Gen'l, U.S. Postal Serv.*, (EEOC Case No. 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X Dec. 29, 1997).) On appeal from this ruling, the EEOC affirmed, ruling against Baker. *See Baker v. Henderson*, EEOC Appeal No. 019819162, 2001 WL 953635, at *1 (EEOC June 26, 2001). Baker subsequently filed this lawsuit on January 22, 2002.

During the time Baker's complaint was wending its way through administrative proceedings, she was working at the Merchandise Mart. While there, she filed four more EEOC complaints based on other alleged harassment, as well as a union grievance. (Def. SF ¶ 58.) This litigation prompted settlement negotiations, which appear to have been conducted with the

involvement of an ALJ. (*See* Pl. Ex. 17 at 2 (letter from Plaintiff's counsel, copied to Judge

Julie Bretz).)   On January 5, 2002, Baker and her attorney both signed a Stipulation and

Settlement Agreement with the Postal Service. (Def. SF ¶ 59.)[8]  That agreement (which was

signed some six months after the EEOC affirmed two prior administrative adjudicators in

dismissing the claims at issue in this suit, but prior to Baker's filing of this lawsuit) states:

> Mitzi Baker agrees to dismiss this action with prejudice, to waive any and all claims
> against the United States Postal Service, and release the United States Postal Service, its
> agents and employees, from all liability for any claims arising out of any of the facts
> alleged in these consolidated and pending causes of action against the Postmaster General
> or any employees or agents of the United States Postal Service as of the date of the
> execution of this Settlement Agreement.

(Def. Ex. 1 ¶ 1.)  The agreement also called for Baker to "submit her written resignation from the

Postal Service," and by the agreement, Baker also agreed that she would "not seek or accept

employment with the United States Postal Service at any time in the future." (Def. Ex. 1 at 2.)

The agreement, which was supported by valid consideration, ends by stating:

> The parties agree after reviewing the entire agreement, they freely and voluntarily enter
> into it and recognize that this document will bind all the parties to the agreement.  The
> parties have read the stipulation contained in the Stipulation and Settlement Agreement.
> Mitzi Baker agrees that she has been counseled by her representatives and states that she
> fully understands the terms and conditions of this Stipulation and Settlement Agreement.

(*Id.* ¶ 9.)  Mitzi Baker resigned from the Postal Service on February 1, 2002, in accordance with

the settlement agreement. (Def. SF ¶ 69.)

---

[8] Baker has been represented by various attorneys during her employment disputes, and
as best the Court can tell, she was represented by counsel throughout virtually all of the events
that might bear on this case.  Baker has been proceeding *pro se* only since the Government filed
its summary judgment motion, after which time she appears to have discharged her attorney after
Baker and the attorney "had differences of opinion on some critical matters of her case." (D.E.
55 at 1 ("Motion of Plaintiff's Attorney For Leave to Withdraw as Her Attorney.").)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ANALYSIS

Count I of Baker's complaint alleges unlawful employment discrimination by Defendant in violation of the Rehabilitation Act and the ADA, apparently in the form of a failure to accommodate her disability. (*See* Compl. ¶ 31.) Baker makes numerous factual allegations in Count I as to incidents that she apparently believes constitute discrimination. (*See id.* ¶¶ 11-13, 15-17, 19, 22, 24-27, 30.) These incidents range from Thomas requesting fitness-for-duty exams (*id.* ¶ 25) to various violations of her work restrictions (*id.* ¶¶ 15-17, 19, 20, 22, 24, 26). Count II attempts to state, as best the Court can tell, a claim for discrimination, apparently on the theory that the actions of others she described were done solely on the basis of her disability. (*See id.* ¶ 36.) Count III alleges unlawful discrimination in retaliation for Baker's filing of an EEO sexual

14

harassment complaint against her former supervisor, Robert Bisbee. (*See id.* ¶ 39.) In this count, too, Baker makes numerous factual allegations of incidents of discrimination, including that Baker was removed from an assignment (*id.* ¶ 39), that a co-worker threatened to beat her up (*id.* ¶ 40), and that her supervisors disregarded her work restrictions (*id.* ¶¶ 44, 47). (*See also id.* ¶¶ 41, 43, 45, 56, 50-58.)

Defendant makes the following arguments in its Motion: (1) Baker is barred from recovery based on a prior signed release of "any and all" of her claims against the Postal Service; (2) Baker cannot make out a *prima facie* case of discrimination; (3) Baker's lawsuit must be limited to the claims raised in her EEOC complaint; (4) some of Baker's claims are barred by *res judicata* and/or collateral estoppel; and (5) Baker cannot make out a *prima facie* case of retaliation. For the reasons described below, the Court agrees with the EEOC and finds that Baker has not presented a triable case of illegal conduct. Specifically, the Court finds that (1) Baker's claims are limited by the scope of her EEOC charge; (2) Baker cannot make out a *prima facie* case of discrimination or retaliation; and, alternately, (3) Baker is barred from recovery based on the settlement agreement she signed regarding unrelated claims against the Postal Service. Although the government presents other arguments that appear strong, the Court need not reach those arguments to resolve the case.

III.    The Lawsuit Is Limited By the Scope of the EEOC Charge

Defendant argues that Plaintiff's claims should be limited by the scope of the EEOC charge filed by Plaintiff. As explained below, Baker's EEOC charge is materially narrower than the ranging series of allegations—which often involve different time periods and different people—she presents in her Second Amended Complaint and also presents (often without proper

15

evidentiary support, if any at all) in her summary judgment papers.

"As a general rule, a . . . plaintiff [in an employment discrimination case] cannot bring claims in a lawsuit that were not included in her EEOC charge." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (Title VII); *see also Kersting v. Wal-Mart Stores*, 250 F.3d 1109, 1118 (7th Cir. 2001) (ADA). "This limitation is consistent with the principle of primary jurisdiction in the agency, for it gives the employer some warning of the conduct about which the employee is aggrieved, and it affords the agency and the employer an opportunity to attempt conciliation without resort to the courts." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992). In many cases challenging the scope of the subsequent complaint, as in this one, "the question of congruence arises because the charge was fairly detailed and the subsequent complaint deviated from the specific instances of discrimination." *Id.* (collecting cases).

Understanding that most EEOC complaints are filed by laypersons, the Seventh Circuit instructs that a plaintiff in an employment discrimination case "need not allege each and every fact that combines to form the basis of each claim in her complaint." *Cheek*, 31 F.3d at 500. Rather, to determine whether the allegations in the complaint fall within the scope of the earlier EEOC charge, the Court "must look at whether the allegations are like or reasonably related to those contained in the charge." *Kersting*, 250 F.3d at 1118 (internal quotations omitted). "Claims are reasonably related if there is a factual relationship between them . . . [which] means that 'the EEOC charge and the complaint must, at a minimum, describe the *same conduct* and implicate the *same individuals*.'" *Id.* (quoting *Cheek*, 31 F.3d at 501) (emphasis in original).

The government argues that throughout the administrative process, Baker's complaint was limited to the sole claim that her Station Manager, Thomas, attempted to have her relocated

and/or removed from her carrier position (with related complaints about the employment of fitness-for-duty examinations), and that the new charges in her complaint are not reasonably related to Baker's raised claims. Baker's EEOC charge alleges, "Leslie Thomas, station manager and [sic] Jackson Park, discriminated against me because of my handicap/disability (my medical condition of plant fasiitis [sic]), and subjected me to reprisals and retaliation [sic] because of my prior and current eeo activity." (Def. Ex. 2 at 131.) In two pages of single-spaced attached allegations, Baker described how Thomas "initiated and pursued process from 1994 - 12/95 to use a fitness for duty examination as an excuse to remove me from my carrier position." (*Id.* at 132 ¶ 3.) Baker further described, *inter alia*, how Thomas posted her position as vacant, sent a letter to the Injury Compensation Unit requesting her relocation, and requested fitness-for-duty examinations concerning her foot condition. (*Id.* at 132-33 ¶¶ 5, 6, 8-12.) Baker also described how she received a notice of reassignment to the Fort Dearborn station, although she later received a memo telling her to disregard the notice. (*Id.* at 132 ¶¶ 16, 17.)

Apart from allegations related to Thomas's attempt to relocate Baker and the related fitness-for-duty examinations, Baker alleges in her Second Amended Complaint numerous actions involving persons other than Thomas who perpetrated other allegedly discriminatory conduct. For example, Baker makes a number of allegations concerning one of her supervisors, Ruby Walker, including that Walker did not allow Baker to use a rest bar while seated (Compl. ¶¶ 11, 15, 17, 44), that Walker required Baker to deliver mail in a manner that violated her medical restrictions (*id.* ¶¶ 12, 13, 16, 19, 43), that Walker improperly removed her from an assignment on which she had successfully bid (*id.* ¶ 39), and that Walker threatened to "physically beat up" Walker (*id.* ¶ 40). Baker also alleges that Carol Coursey, another of Baker's

supervisors, made Baker deliver mail or otherwise perform work in violation of her medical restrictions (*id.* ¶¶ 22, 27), made Baker do work "in an attempt to provoke . . . other carriers to be angry at [Baker]" (*id.* ¶ 46), took Baker's rest bar away from her (*id.* ¶ 47), and put in an unjustified notice of absence for Baker (*id.* ¶ 52). Baker also alleges that Perry Williams, Mr. Reed, Mr. Crisp, and Mr. Silers, other supervisors, made her work in violation of her medical restrictions (*id.* ¶¶ 24, 30, 45, 56; *see also* Pl. SAF ¶ 66); that she was threatened in various ways by Mr. Flowers (a manager), Crisp, and Regina Boxley (apparently Baker's co-worker) (Compl. ¶¶ 50, 57; *see also* Pl. SAF ¶ 67); that a co-worker, Mr. Brignac, "smacked Plaintiff across her head with a magazine" with no action taken by management (Compl. ¶ 54); that she was ordered to do jobs that no other carrier was ordered to do (*id.* ¶ 55); and that another carrier, Mr. Nunnually, intentionally attempted to get her disciplined (*id.* ¶ 52). To the extent that these facts are sufficient to constitute discriminatory actions in and of themselves (which the Court need not decide) these claims are not reasonably related to Baker's allegations in her EEOC complaint. These allegations involve persons other than Thomas, and involve conduct other than an attempt to transfer Baker by subjecting her to fitness-for-duty examinations. Baker's EEOC charge would not give Defendant notice that Baker claims she was aggreived by this conduct. Thus, any claims based on these allegations are outside the scope of the EEOC complaint and are not properly before the Court.

Baker also makes several allegations about Thomas's actions toward her that do not relate to her allegations of Thomas's attempt to relocate her using fitness-for-duty examinations. For example, she alleges that he assigned her to sort another carrier's mail, which led to that carrier yelling at her. (Compl. ¶ 53.) Given that Baker has not alleged that this action was part of

Thomas's alleged scheme to have Baker relocated (or that this carrier could have had any impact her relocation), the Court finds that this allegation is not reasonably related to Baker's EEOC charge. Baker also alleges that Thomas, along with her other supervisors, ordered her to work in violation of her medical restrictions. (*Id.* ¶¶ 24, 43.) Without some allegation that would demonstrate that Thomas ordering Baker work in violation of her medical restrictions would have impacted Thomas's alleged attempt to relocate Baker, the Court finds that these allegations, too, are not reasonably related to the allegations in Baker's EEOC charge.

In addition to the difference in facts alleged as to time period and persons involved, Plaintiff offers different theories of recovery in her complaint than in her EEOC charge. In particular, Plaintiff's EEOC charge contained no allegations that would support a failure to accommodate claim. "Discrimination" as used by the ADA includes two distinct types of cases: failure to accommodate and disparate treatment. *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997). In determining whether allegations in a complaint are reasonably related to allegations in the EEOC charge, the Court also asks whether an "'EEOC investigation could reasonably be expected to grow from the original complaint.'" *Ayaji v. Aramark Business Servs., Inc.*, 336 F.3d 520, 527 (7th Cir. 2003) (quoting *Novitsky v. Am. Consulting Eng'rs, L.L.C.*, 196 F.3d 699, 701 (7th Cir.1999)). A complaint of disparate treatment and retaliation would not naturally lead into an investigation of a failure to accommodate. *See Green v. Nat'l Steel Corp. Midwest Div.*, 197 F.3d 894, 897-98 (7th Cir. 1999) (holding that a "claim for failure to accommodate is separate and distinct under the ADA from one of disparate treatment because of a disability," and thus former is not reasonably related to latter) (citing *Weigel v. Target Stores*, 122 F.3d 461, 464 (7th Cir. 1997)). Moreover, on the facts of this particular case, no

19

speculation is needed as to whether the EEOC would be *likely* to investigate a failure to accommodate claim based on Baker's charge of discrimination and retaliation—it did not do so in fact. In the EEOC appeal of Baker's administrative investigation, the EEOC addressed Baker's discrimination and retaliation claims, as well as whether subjecting Baker to fitness-for-duty examinations was a form of harassment. *See Baker v. Henderson*, 2001 WL 95635, at *4-5. The EEOC rejected all the claims but did not address a failure to accommodate.

Thus, summary judgment is granted as to Count I, alleging a failure to accommodate, and Counts II and III are limited in scope to claims of disparate treatment (including by harassment) and retaliation based on Thomas's alleged attempt to have Baker relocated.

IV.    Plaintiff Has Not Made Out a *Prima Facie* Case of Discrimination or Retaliation

Before proceeding to the merits of the other arguments, the Court notes the significance of Plaintiff's practice of referring to unsupported alleged factual episodes. This practice is inappropriate and cannot be a basis for analyzing the propriety of summary judgment. In this regard, the Seventh Circuit has repeatedly instructed that summary judgment is the "put up or shut up moment in the lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (internal quotations omitted); *accord, e.g., Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("[S]ummary judgment 'is the "put up or shut up" moment in a lawsuit.'") (quoting *Schacht v. Wisc. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir.1999)). As a result, the Court will limit its review of Baker's case to the facts she has properly presented in summary judgment. Even if the Court had not limited to the scope of the Complaint based on Baker's allegations in her EEOC charge, Baker has put forward no evidence

20

to support the majority of the specific allegations in her Second Amended Complaint (and references other unsupported alleged episodes in her summary judgment papers). These allegations are not properly considered. *See, e.g., Koszola*, 385 F.3d at 1111.

The Rehabilitation Act provides that no "otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be . . . subjected to discrimination . . . by the United States Postal Service." 29 U.S.C. § 794(a) (2002). This Court looks to the standards applied under the ADA to determine whether a violation of the Rehabilitation Act occurs in the employment context. *See* 29 U.S.C. § 794(d); *Dyrek v. Garvey*, 334 F.3d 590, 597 n.3 (7th Cir. 2003). The Rehabilitation Act, through incorporation of ADA standards, also prohibits discrimination in the form of retaliation against an individual who has made a charge or otherwise participated in an EEO proceeding. 29 U.S.C. § 794(d) (incorporating 42 U.S.C. § 12203(a)).

Count II of Baker's complaint could be read to state a claim of discrimination for attempting to transfer her or by creating conditions of employment that constitute harassment. Count III states a claim for unlawful retaliation. Baker has failed to make out a *prima facie* case for any of these claims.

A.      Retaliation

A plaintiff may establish a *prima facie* case of retaliation through either the direct or indirect method of proof. Under the direct method, he presents "direct evidence . . . that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains." *Stone v. City of Indianapolis*, 281 F.3d 640, 644 (7th Cir. 2002). The indirect method "requires the plaintiff to show that after filing the

21

charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner." *Id.* Defendant argues that summary judgment is appropriate on Baker's retaliation claim because she has not pointed to any similarly situated employees who were treated differently, she has not suffered an adverse employment action, and she has not demonstrated that she was performing her job in a satisfactory manner.

In the retaliation context, "the range of employer conduct that constitutes an adverse employment action is broad, but not unlimited." *Johnson*, 325 F.3d at 902. The Seventh Circuit teaches that there are three basic categories of cases where courts have found the criteria for materially adverse employment actions to be met:

> (1) cases in which the employee's compensation, benefits or other financial terms of employment are diminished, including cases where employment is terminated; (2) cases in which a nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced; and (3) "[c]ases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the *conditions* in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment—an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet."

*Tart v. Ill. Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004) (quoting *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002) (emphasis in original)). In any case, "the employee must complain of some action on the employer's part that causes her to suffer a real harm." *Johnson*, 325 F.3d at 902; *see also id.* (finding that denial of a back brace and enforcement of a rule that employees may not work while taking prescription medicines "are not the type of employer actions that our cases label materially adverse").

The unsuccessful attempts by Thomas to have Baker reassigned to a station not of her choosing (she was ultimately reassigned to Merchandise Mart, the station she *had* been seeking) does not rise to the level of an adverse employment action. The Seventh Circuit instructs that "it is well established that unfulfilled threats that result in no material harm cannot be considered an adverse employment action." *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1030 (7th Cir. 2004) (citing *Ajayi*, 336 F.3d at 531). In *Rizzo v. Sheahan*, 266 F.3d 705, 717-18 (7th Cir. 2001), the Seventh Circuit held that a supervisor's threats to alter plaintiff's work schedule or terminate her, phone calls to the plaintiff's home threatening that plaintiff's family would suffer if she did not withdraw her complaint, and other hardships the plaintiff suffered at work, such as interference with her ability to take her lunch break, did not constitute materially adverse employment actions in the context of a retaliation claim. The Court held that these actions were "disconcerting" but that they did not "alter the terms or conditions of her employment such that they can be characterized as adverse employment actions that constitute instances of actionable retaliation." *Id.* at 718 (citing *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1086 (7th Cir. 2000)) (internal quotation and alteration omitted). Similarly, while Baker may have found Thomas's unsuccessful attempts to relocate or reassign her disconcerting, they did not alter the *conditions* of her workplace. Thus, Thomas's actions do not constitute an adverse employment action.

Nor do the fitness-for-duty examinations themselves rise to the level of an adverse employment action. The simple fact of being subjected to a medical examination is not *per se* degrading or humiliating—at least on the facts of this case, which involves a potential podiatrist examination of one's feet. The Court need not and does not rule that a plaintiff could not put

23

forward evidence that would bring a medical examination to the level of a materially adverse employment action—such as, by way of example, requiring an employee to submit to a dangerous or personally invasive procedure. But Baker has neither alleged nor offered any evidence of that nature. In the absence of any evidence that the foot examinations she did submit to were particularly grueling or humiliating, the Court finds that Baker was not subject to an adverse employment action by being asked to or having to submit to the fitness-for-duty examinations at issue here.[9]

Plaintiff argues that the combined actions of Postal Service employees during the time period in question constituted unlawful harassment. The Seventh Circuit has not recognized an ADA claim based on hostile environment or harassment. *See Conley v. Village of Bedford Park*, 215 F.3d 703, 712-13 (7th Cir. 2000) (collecting cases and stating "[t]his court has not yet resolved the issue whether the ADA encompasses a cause of action for hostile work environment. Thus far, we have assumed the existence of such claims, without expressly deciding whether they are proper, because resolution of that issue has not been necessary.") (internal quotation marks and citation omitted). This Court need not decide whether such a claim is cognizable because, as in prior cases, the alleged harassment in this case is not "'significant enough to rise to the level of

---

[9] The government contends, and Baker does not dispute, that a reassignment in the form of a lateral transfer is not an adverse employment action (D.E. 53 at 11 (collecting Seventh Circuit cases)), and also that a reassignment to a new position may be required under the law as a reasonable accommodation where the employee can no longer perform the essential functions of her current position. (*Id.* (collecting Seventh Circuit cases); *see also* D.E. 64 at 8.) Baker has not alleged that any position which could have resulted from her reassignment would have been materially different from her position at the Jackson Park station. Because an employee cannot dictate the choice of alternative positions for reassignment, Baker cannot contend that she was specifically entitled to a Merchandise Mart reassignment given Defendant's evidence that there were no positions which fit within Baker's medical restrictions there. (Def. SF ¶ 40.)

a hostile environment were that type of claim available.'" *Id.* at 713 (quoting *Vollmert v. Wisc. Dep't of Transp.*, 197 F.3d 293, 297 (7th Cir. 1999)). In order for harassment to constitute an adverse employment action for purposes of employment discrimination, it must be actionable—that is, severe or pervasive. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 466 (7th Cir. 2002) (citing *Stockett v. Muncie Ind. Transp. Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000). The Seventh Circuit has instructed in this regard that conduct that does not rise to the level of a hostile work environment is not severe enough to constitute an adverse employment action. *See Hilt-Dyson*, 282 F.3d at 466.[10] All Baker's claims taken together—the posting of her position as vacant, mistakenly informing her she had been transferred, requesting that she submit to fitness-for-duty examinations, and undergoing such examinations—are not "'so severe or pervasive as to alter the conditions of [her] employment and create an abusive working environment.'" *Conley*, 215 F.3d at 713 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)) (alteration omitted).

Thus, Baker has failed to establish an essential element of her case, *i.e.*, she was subject to an adverse employment action, and summary judgment is proper as to Count III. The Court need not reach the government's various other arguments in support of dismissing the claim.

B.    Disparate Treatment

To make out a prima facie case of discrimination based on disparate treatment because of

---

[10] *Hilt-Dyson* stated that "this aspect of Ms. Hilt-Dyson's claim of retaliation [*i.e.*, the harassment aspect] overlaps with her claim of sex based discrimination. We have already concluded that . . . Sutherland's conduct during the inspection was not severe enough to constitute actionable sexual harassment. Under our case law, it follows that any harassment or humiliation Ms. Hilt-Dyson suffered during the inspection was not severe enough to constitute an adverse employment action." *Hilt-Dyson*, 282 F.3d at 466.

disability, a disabled employee must show that (1) she is disabled; (2) she performed her job satisfactorily; (3) she has suffered from an adverse employment action; and (4) similarly situated employees received more favorable treatment. *See Amadio v. Ford Motor Co.*, 238 F.3d 919, 924 (7th Cir. 2001). Like other employment discrimination statutes, a plaintiff under the ADA may proceed under either the direct or indirect method. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). Defendant argues that summary judgment is proper because Baker has not shown that (1) she could perform the essential functions of the position; and (2) she suffered from an adverse employment action. As discussed in detail above, the Court finds that neither Thomas's alleged attempts to have Baker relocated using fitness-for-duty examinations nor the examinations themselves rise to the level of an adverse employment action, nor do they constitute actionable harassment that rises to the level of an adverse employment action. Thus, Baker has failed to establish an essential element of her case, and summary judgment is appropriate on Count II. The Court need not reach Defendant's other contentions.[11]

V.  Plaintiff's Claims Are Barred By Stipulation and Settlement Agreement

As an alternate and independent grounds for decision, the Court finds that all of Baker's claims are barred by the Stipulation and Settlement Agreement she signed in connection with unrelated claims stemming from her employment at the Merchandise Mart. Defendant argues that Baker's waiver of her federal employment discrimination rights against the Postal Service was knowing and voluntary, and that the language of the settlement agreement unambiguously

---

[11] Although not necessary to this decision, it is worth noting that Plaintiff's own podiatrist contended that she she was not "able to perform the job of a [letter] carrier" in the last medical examination that Plaintiff provided before being asked (and refusing) to take additional examinations to see how she might be utilized in the future. (Def. Ex. 2 at 36 (letter from Dr. Horsley).)

waived her rights to *all* claims, not just the consolidated claims in the suit prompting the agreement.

The Seventh Circuit teaches that "the prerogative of litigating one's [employment discrimination claims based on disability] in federal court is the type of important right the relinquishment of which requires a knowing and voluntary waiver." *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1129 (7th Cir. 1997); *see Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51-52 n. 15 (1974); *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 571 (7th Cir.1995) ("*Pierce I*"). The Seventh Circuit also has instructed that, where valid, such waivers promote the "important federal policy" of encouraging the voluntary resolution of discrimination claims. *Pierce I*, 65 F.3d at 572. Moreover, the Seventh Circuit has repeatedly held that where, as here, a plaintiff executes a release with the assistance of counsel (Baker's attorney actually signed the release along with her), the plaintiff-signor is "presumed to have executed the document knowingly and voluntarily absent claims of fraud or duress." *Id.* at 571 n.1 (internal citation omitted). Because the Postal Service seeks to enforce Baker's waiver of her civil rights, the Postal Service bears the burden of showing that Baker consented knowingly and voluntarily to the settlement agreement. *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 110 F.3d 431, 438 (7th Cir. 1997) ("*Pierce II*"). Baker, however, bears the burden of production to come forward with "specific evidence sufficient to raise a question as to the validity of the release." *Id.* When a plaintiff has come forward with such evidence, the Court uses a "totality of the circumstances" test to examine the validity of the waiver. *Pierce I*, 65 F.3d at 571. Under that test, a court looks to a number of factors, including, but not limited to:

(1) the employee's education and business experience; (2) the employee's input in

27

negotiating the terms of the settlement; (3) the clarity of the agreement; (4) the amount of time the employee had for deliberation before signing the release; (5) whether the employee actually read the release and considered its terms before signing it; (6) whether the employee was represented by counsel or consulted with an attorney; (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law; and (8) whether the employee's release was induced by improper conduct on the defendant's part.

*Id.*

Here, there is an initial question as to whether Baker has come forward with any specific evidence to constitute a challenge to whether the waiver was knowing and voluntary. While she challenges Defendant's argument that the agreement was unambiguous at substantial length, she makes no specific argument that the waiver was not knowing and voluntary. (Indeed, the only time Baker even references this issue is at the conclusion of a paragraph arguing the existence of an extrinsic ambiguity in the agreement. (D.E. 61 (Pl. Resp. Br.) at 13.)

As explained, an employee who executes a settlement release pursuant to the advice of independent counsel is presumed to have executed the document knowingly and voluntarily. *See Pierce I*, 65 F.3d at 571 n.1; *Riley v. Am. Family Mut. Ins. Co.*, 881 F.2d 368, 373-74 (7th Cir. 1989). Both Baker and her attorney signed the agreement, which expressly states that the signatories have reviewed the entire agreement and that the parties are "freely and voluntarily" entering into it. (*See* Def. Ex. 1 (settlement agreement at 3, ¶ 9).) Baker offers no evidence that could fairly be construed as an allegation of fraud as against the government attorney who negotiated the release. It appears that during the course of the negotiations, Baker's attorney wrote to the government attorney (with the ALJ "cc'd" on the letter) and commented that the settlement should only resolve the four EEOC complaints that prompted the settlement dialogue and not any other claims, including in particular, a separate matter that is not the subject of the

suit *sub judice*. (Pl. Ex. 17 at 1-2.) Plaintiff's attorney also specifically requested various other language, some of which was incorporated into the signed agreement and some of which was not. (Id. at 1-2.) Plaintiff's attorney concluded the letter by stating that "[n]otwithstanding the foregoing, we find the agreement to be acceptable and my client is prepared to execute the agreement immediately." (*Id.* at 2.) (The agreement called for Baker and her counsel to receive $200,000 in response to the release and Baker's agreement to resign from the Postal Service.) Baker also points to what purports to be a facsimile from Baker to her attorney, in which she tells her attorney that she intends to pursue her arbitration-related case, as well as to appeal the EEOC rejection of the claims that ultimately formed the basis for the instant suit, and Baker asked her attorney to "add language in the agreement that [sic] does not involve either case. I am resolving issues in this case." (Pl. Ex. 19.)

As indicated, Plaintiff does not build on this evidence in a way to create a viable fraud allegation against the government attorney (or the ALJ involved in the settlement dialogue). The only evidence Baker identifies is a letter from the government attorney to her former counsel, in which the government states that its attorney had "reviewed your requests and, for the most part, find them to be reasonable and, therefore, have made appropriate changes in the settlement agreement." (Pl. Ex. 33. at 1.) But stating that one has "for the most part" accepted another party's proposed revisions is not a representation that any of them has been accepted. As stated, the government accepted at least some of the suggested revision and did not incorporate other parts. Nothing in the government's letter suggests fraud; instead, it suggests that some issues were not resolved in Baker's favor, as both she and her lawyer would recognize when they reviewed the document prior to signing it. *See generally Pierce I*, 65 F.3d at 572 (stating that "a

29

bald assertion of misrepresentation by the employer, standing alone, is legally insufficient" to raise a question of the validity of a waiver). In sum, Baker has not alleged nor offered evidence of fraud or duress by the Postal Service during the settlement negotiations and subsequent signing.[12]

Even if Baker had come forward with specific evidence sufficient to raise a question as to the validity of the release on the grounds that it is not knowing and voluntary, the Court finds, under the totality of the circumstances, that she has not created a triable issue of whether the release was knowingly and voluntarily made. Baker had an attorney representing her during the negotiations and final signing. The negotiations were conducted, by all appearances, under the auspices of an ALJ. (*See, e.g.*, Pl. Ex. 19 (plaintiff telling her lawyer to reiterate her views to Judge Bretz).) Baker was involved in the negotiations, reviewed and provided feedback on draft language, and reviewed the final agreement before signing it. There was no government misconduct, and the signed agreement expressly states that Baker and her counsel read it and signed it voluntarily and knowingly. The language of the waiver is clear, as explained further below. And the agreement called for payment to Baker of substantial consideration—$200,000 to sign the release and forever leave the employ of the Postal Service.

---

[12] Baker suggests that her own lawyer inaccurately explained to her the effect of the release. (Pl. Ex. 44 at ¶ 4 ("Mr. Jones assured me that I would not be giving up my rights to pursue this case in federal court by signing the settlement agreement.").) Seventh Circuit precedent instructs that such a claim may provide the basis for a suit against the attorney but cannot be used to vitiate the bargain with the government. *See Riley*, 881 F.2d at 374 (where a plaintiff is represented "by counsel who actively negotiated the release, plaintiff must be found to have executed the release or settlement voluntarily and knowingly, unless vitiating circumstances such as fraud or duress existed to nullify plaintiff's assent to the settlement. The fact that plaintiff's counsel may have inaccurately conveyed the effect of the release or failed to draft language adequate to protect plaintiff's Title VII right may be remedied through a malpractice action, but not through judicial interpretation of plaintiff's subjective intent.").

Plaintiff also argues that the language of the waiver and release contains an extrinsic ambiguity, and that the Court should interpret it such that it does not cover the claims in the instant case—what Baker argues is the "true intent" of the parties to the agreement. The Court respectfully rejects this position. The waiver in the agreement on its face states that it relates to "any and all claims against the United States Postal Service." (*See* Def. Ex. 1, ¶ 1.) Moreover, the agreement states that Baker agrees to "release the United States Postal Service, its agents and employees, from all liability for any claims arising out of any of the facts alleged in these consolidated *and pending* causes of action . . . as of the date of [this agreement]." (*Id.* (emphasis supplied).) By the time the agreement was signed, Baker already had been pursuing these claims (albeit, unsuccessfully) for years, a pursuit that led to this lawsuit. The Seventh Circuit teaches that the "any and all claims" language of a waiver is not ambiguous. *See Pierce I*, 65 F.3d at 568.

Baker seeks to invoke the doctrine of extrinsic ambiguity to use evidence outside the four corners of the contract to prove that the parties actually meant something other than "any and all claims." Under this doctrine, a party is entitled "to present evidence that although the contract appears to be clear, anyone who understood the real-world context would know that it does not mean what it seems to mean." *AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 574 (7th Cir. 1995) (discussing the two ships *Peerless* in the famous case, *Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng.Rep. 375 (Ex. 1864)). Defendant correctly argues, however, that this is not a case where the phrase "any and all claims" can have some kind of technical meaning or special usage in an industry. *See id.* Baker's reliance on *In re Stoecker*, 5 F.3d 1022 (7th Cir. 1993), where the Seventh Circuit used the doctrine of extrinsic evidence to interpret a similar

comprehensive waiver of claims, is misplaced. In that case, the parties were disputing the meaning of the term "claim," arguing whether an objection filed in a bankruptcy case constituted a "claim" rather than whether all "claims" were waived. *Id.* at 1029-30. The Seventh Circuit called this a "special case" for the invocation of the extrinsic evidence doctrine. *Id.* at 1030. Here, there is no reason to believe that the parties did not mean "any and all claims" when they said exactly that.

Even if the Court were inclined to look at extrinsic evidence to determine whether the parties meant "any and all claims," Baker's evidence does not create a triable issue concerning whether the parties intended to exclude the claims in the instant case from the waiver. The Seventh Circuit instructs that a court may accept only objective evidence—that is, evidence supplied by a disinterested third-party such as trade usage or custom—to show that the contract has a different meaning than its plain meaning. *Pierce I*, 654 F.3d at 568; *AM Int'l*, 44 F.3d at 575. Subjective evidence of a party's own belief as to the meaning of the contract is not admissible. *Pierce I*, 654 F.3d at 568; *AM Int'l*, 44 F.3d at 575. Baker's affidavit testimony that she believed the agreement did not cover the claims in this case is not objective evidence under the "extrinsic ambiguity" caselaw. *See Commonwealth Ins. Co. v. Titan Tire Corp.*, — F.3d —, Nos. 03-3223, 03-3224, 03-3225, 2004 WL 2439727, at *4 (7th Cir. 2004) (rejecting extrinsic ambiguity argument because only subjective evidence offered as to meaning of contract term, *i.e.* deposition of company president who authored disputed term); *id.* ("Subjective evidence is 'the testimony of the parties themselves as to what they believe the contract means.'" (quoting *AM Int'l*, 44 F.3d at 575-76)). The evidence Baker offers in the form of letters and facsimiles between her attorney and the Postal Service's attorney is not objective, nor does it demonstrate

32

that both parties intended to exclude the instant claims. (*See* Pl. Ex. 17, 20, 32-35.) The Postal Service explicitly included one of Baker's requested language changes, *i.e.* the request that the agreement include a provision indicating that the Baker's monetary award included $25,000 in attorneys' fees. (*See* Pl. Ex. 17 ¶ 3; Def. Ex. 1 ¶ 6.) The fact that the waiver language did not excise the claims about which Baker and her attorney expressed concern (*see* Pl. Ex. 19), militates in favor of the opposite conclusion that Baker seeks: that the Postal Service considered the request to limit the waiver but did not agree to it. That conclusion is also consistent with the documentary evidence Baker proffers, which reflects that, notwithstanding the issues flagged in the negotiation process, Baker and her counsel were eager to conclude the transaction. (*See* Pl. Ex. 17 (letter from her counsel offering various comments and proposed revisions, and stating that "[n]otwithstanding the foregoing, we find the agreement to be acceptable and my client is prepared to execute the agreement immediately.").) Finally, the Postal Service attorney's letter replying to Baker's attorney does not indicate one way or the other as to the extent of the waiver. (*See* Pl. Ex. 33.) Thus, even if the Court were to consider Baker's evidence of an extrinsic ambiguity, it would still find that the waiver encompasses all the claims in this lawsuit.[13]

---

[13] In her papers, Baker suggests that even if the waiver is clear, and even if her waiver was knowing and voluntary, the agreement is unenforceable by the Postal Service because of a material breach by the government. Specifically, Baker suggests that the government is in material breach because it failed to expunge all of the negative references in Baker's personnel file. (Pl. Resp. 13-14; Pl. SF ¶¶ 63-65.). This contention is flawed for multiple reasons. First, Baker provides no properly supported factual basis for arguing that such expungement was a condition of the agreement. Second, Plaintiff concedes that all negative references have since been purged in any event, so the issue is moot. Third, to the extent Baker repeatedly contends that the government breached the purging-agreement by citing and discussing the written settlement agreement (which contains no purging language) in this litigation, the contention that the settlement agreement needed to be kept secret is rejected, as explained previously. Finally, the Court respectfully rejects Baker's contention that Defendant's inclusion of Def. Ex. 2 at 196 and 199 are negative references from Plaintiff's personnel file. One of the documents is a single

33

Thus, on the alternate and independent grounds of waiver, the Court finds that summary judgment for Defendant is proper on Counts I, II, and III.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted.

So ordered.

_Mark Filip_

Mark Filip
United States District Judge
Northern District of Illinois

Date: January 20, 2005

---

page of a letter written by plaintiff herself; the other is merely a boilerplate "official notification of your [Baker's] return to duty." Neither of these documents can fairly be seen to be a material breach of any agreement by the government to purge Baker's personnel file of negative references about her.